TOOTLE, HOSEA & CO. v. COLBERT COLDWELL.—JOHN PHILLIPS AND R. B. GRANT, *Copartners Doing Business as Phillips, Grant & Co.,* v. COLBERT COLDWELL. —W. L. REED AND DANIEL B. CLOSSON, *Partners under the Firm-Name of Reed & Closson,* v. COLBERT COLDWELL.—THE GEISECKE BOOT AND SHOE MANUFACTURING COMPANY, *a Corporation Duly Authorized and Incorporated Under the Laws of the State of Missouri,* v. COLBERT COLDWELL.

1. VALID GIFT *by Husband to Wife.* A gift made by a husband to his wife, in good faith, and not for the purpose of hindering, delaying or defrauding his creditors, and at a time when the husband is not owing anything, is not void, but is valid in all respects and for all purposes.

2. PREFERENCE *of Creditors.* A debtor, even in failing circumstances, may prefer creditors, if the same is done in good faith; and this not only in the form of actual payment of money to the particular creditors preferred, but also in the form of the sale or appropriation of property or the giving of chattel mortgages to such creditors.

3. FACTS, *Not Proving Fraudulent Disposal of Property.* Where a debtor is owing the sum of $150 or $160, and such debtor has at the time over $1,600 in cash, which he could use for the purpose of paying such debt, if he chose, and the creditor demands the payment of the debt, and the debtor refuses to pay the same, *held,* that this does not alone or with the other circumstances of the case, prove that the debtor has disposed of, or is about to dispose of, his property, or a portion thereof, for the purpose of hindering, delaying or defrauding his creditors.

4. CHATTEL MORTGAGE, *Valid, and Not to Delay or Defraud.* Where a debtor, in failing circumstances, executes a chattel mortgage to one of his creditors by way of preference, and delivers the same to an agent of the creditor, *held,* that the chattel mortgage is valid; and *further held,* that even if the agent were not an agent for that purpose, still that the transaction, if in good faith, would not necessarily prove that the defendant had disposed of, or was about to dispose of, his property, or a portion thereof, for the purpose of hindering, delaying or defrauding his creditors.

5. CHATTEL MORTGAGES AND ASSIGNMENT, *Not Necessarily Void.* Where a debtor, in failing circumstances, executes certain chattel mortgages and an assignment of his book accounts to certain of his creditors whom he prefers, *held,* that such chattel mortgages and the assignment are not executed under the act relating to voluntary assignments for the

benefit of creditors, (Comp. Laws 1879, ch. 6,) nor in violation of such act; and the chattel mortgages and assignment are not necessarily void, and if they are all executed in good faith they do not prove, or tend to prove, that the debtor has disposed of, or is about to dispose of, his property, or a portion thereof, for the purpose of hindering, delaying or defrauding his creditors.

### Error from McPherson District Court.

FOUR actions, severally, by *Tootle, Hosea & Co., Phillips, Grant & Co., Reed & Closson,* and *The Geisecke Boot and Shoe Manufacturing Company,* against *Coldwell.* January 27, 1883, the district court, in each case, dissolved the attachment which had been issued therein, which rulings the plaintiffs have brought here.

*Waller & Earle, John D. Milliken, D. O. Barker,* and *T. F. Garver,* for plaintiffs in error.

*Simpson & Bowker,* and *C. Coldwell,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: In January, 1883, several actions were commenced against Colbert Coldwell by certain of his creditors, among which actions are the following: Tootle, Hosea & Co. *v.* Colbert Coldwell; John Phillips and R. B. Grant, copartners doing business as Phillips, Grant & Co., *v.* Colbert Coldwell; W. L. Reed and Daniel B. Closson, partners under the firm-name of Reed & Closson, *v.* Colbert Coldwell; and The Geisecke Boot and Shoe Manufacturing Company, a corporation duly authorized and incorporated under the laws of the state of Missouri, *v.* Colbert Coldwell. In each of these actions an order of attachment was issued.

In the first action, the grounds for the attachment are stated in the plaintiffs' affidavit as follows:

"That the said defendant has sold, conveyed and otherwise disposed of his property, with the fraudulent intent to cheat and defraud his creditors, and to hinder and delay them in the collection of their debts.

"Affiant further states that the defendant is about to make such sale and conveyance and disposition of his property with

such fraudulent intent, and is about to remove his property, or a material part thereof, with the intent and to the effect of cheating and defrauding his creditors, and of hindering and delaying them in the collection of their debts."

In the second action, the grounds for the attachment are stated in the plaintiffs' affidavit as follows:

"That said defendant is about to remove his property, or a part thereof, out of the jurisdiction of the court, with the intent to defraud his creditors; and is about to convert his property, or a part thereof, into money, for the purpose of placing it beyond the reach of his creditors; and is about to assign, remove and dispose of his property, or a part thereof, with the intent to defraud, hinder and delay his creditors; and has assigned, removed and disposed of his property, or a part thereof, with the intent to defraud, hinder and delay his creditors; and has mortgaged his property, with the fraudulent intent to hinder and delay his creditors in the collection of their debts."

In the third and fourth actions, the grounds for the attachments are precisely the same as the grounds in the second action, except the words, "has mortgaged his property with the fraudulent intent to hinder and delay his creditors in the collection of their debts," are omitted, and the words, "has property and rights in action which he conceals," are inserted.

Afterward the defendant filed a motion in each of these actions to dissolve the attachment therein, upon the ground that the grounds set forth in the affidavit for the attachment were not true. These motions were all heard at the same time and upon the same evidence; and upon such evidence the court made the following findings of fact and law in each case, to wit:

"FINDINGS OF FACT BY THE COURT.

"1. On January —, 1883, the plaintiffs herein and some seven other trade creditors commenced suits in this court on valid claims of indebtedness, and in a proper manner procured attachments on them, the writs of which were levied on a certain lot of goods theretofore belonging to defendant, but at the time of the levy they were in the possession and control of certain mortgagees, hereinafter named, of defendant. The defendant then denies on oath the truthfulness of

the grounds for attachment, as set forth in the several affidavits, and files thereon his motion to discharge the several attachments, which motions, by agreement of counsel, were tried all together, the proofs introduced applying to all.

"2. The proofs introduced upon said motions show substantially the following material facts, stating them in the order of time and in the order as introduced principally: The defendant is sixty years of age, a lawyer by profession; lived in Texas during the late rebellion, at the end of which he became a district and afterward one of the supreme judges of the state. In 1873 he accepted the position of United States collector of customs, and was stationed at El Paso, Texas. At the end of four years in this office, he resigned, and in May, 1877, removed to Winfield, Kansas, to settle in the practice of his profession. At this time of leaving Texas and coming to Kansas, he had in cash between $7,000 and $8,000, which he had saved from his professional earnings since the war. He understood and believed that, under the laws of Texas when this was earned, onehalf of it belonged to his wife, the name of which personage is Martha J. Coldwell. He so told her, and that as they were getting along in years, she had better take her share, that she might always be provided with enough to make her a home. He so gave it to her, and at which time he was owing no one. She so accepted it, and on settling at Winfield, Kansas, she bought with a portion of this money some town lots and built thereon a residence, consuming thereby the most of this share so given to her in money. This property was the family homestead of defendant while living at Winfield — occupied and used continuously as such, but always known, understood and called by the family as the property of the wife. The deed was taken in her name and duly put upon record. The defendant's practice here (at Winfield) was not very lucrative; some of his daughters were married and settled, and altogether his expenses were considerable, until in the summer of 1880 he found his share of the property so brought to Kansas expended and gone, together with $1,000 cash which his son William had given him on leaving Texas to loan for him, which sum ($1,000) it seems was the savings from personal earnings of said son William; was so extended to his father and given in cash, and for which his father gave a receipt of some character, and which sum was loaned by defendant at Winfield in son's name for a while, but afterward was used by defendant as aforesaid.

During the summer of 1880, some of the friends of defendant advised him to engage somewhere in the boot-and-shoe business. He talked the matter over with his wife, and they thought it would be better for him to engage in some mercantile business. But defendant had no property or money with which to do so. They concluded at last that the wife would sell the said homestead and let him have the money to so embark in business. She did so, getting $2,250 cash, and loaned it to her husband, he giving her shortly after a promissory note therefor, due one day after date. He took this money and engaged in the boot-and-shoe business in McPherson, Kansas, renting a building and buying his first bill of goods in August, and immediately afterward opening his establishment. From that date till August, 1882, we know but little of his business, save that there had been some net profit in it. In said August he had a stock of about $3,300 and was owing the trade about $1,200. He intended to do a cash business, but had open accounts with friends or persons he knew. There was a very large wheat crop in McPherson county in 1882. The county seemed to be prospering and growing, and the defendant thought he would do a large business during that fall and winter. He consequently bought largely of goods which were shipped to him and had in store, and he also sampled other goods and made lists, that he might order them if necessary — that is, if his sales and business demanded. The fall and early winter however brought very mild weather, and, contrary to defendant's said plans and expectations, sales were no larger than ordinary — that is, no larger than they had been in the preceding years at like season. Things were thus running when, on the 20th of December, 1882, Mr. Waller, an attorney at law at McPherson, called on defendant and presented the claim of plaintiffs herein for payment, about $150 of which was then due and the balance not due. The trade collections against the defendant had generally come through the banks. Defendant told Mr. Waller his sales had not been as large as he anticipated when ordering his fall stock of goods, and that he could not then pay him, and that he asked for an extension. Mr. Waller demanded security by chattel mortgage. The defendant said to do that was an act of bankruptcy, and if he took that course he would have at once to stop business. At the suggestion of a son of defendant (clerking in the store), the defendant then offered to turn out goods to satisfy the claim, and mostly of the very goods purchased of plaintiffs.

9 — 30 KAS.

This was refused, and cash or mortgage or bankable security required, which was alike refused, it not being the habit of defendant to ask others to become his security, and he thought then he would not give mortgages. On this very date the value of the stock of defendant was $7,300. He had $1,640 in cash, and a few book accounts. His trade indebtedness was $6,000 or upwards, $800 of which was then due, and nearly all to be due January 15, 1883. The defendant had been seeing for some time that he would not be able to meet all his trade indebtedness as it would become due, and he had concluded prior to December 20, in his own mind, to try to arrange for an extension; and to carry out this he was saving his cash to pay *pro rata* to all his creditors; and this was the reason he did not pay plaintiffs' claim when demanded by Mr. Waller on said 20th day of December, nor the other claims due which were also pressing him. The defendant revolved the condition of his affairs in his mind on that day and night of December 20, and came to the conclusion that plaintiffs and perhaps others were going to press him; that he could not meet all and pay, and that he had got to suspend business; that he could not go through, and he resolved to prefer certain creditors. In pursuance of this resolution, he had drawn and he executed on December 21, chattel mortgages on the stock of goods in his business to persons in amounts as follows, and established priority in them in order as here stated, to wit: To Martha J. Coldwell, $2,670, due in thirty days, the consideration of which is the aforementioned indebtedness to his wife, principal and interest; to Claflin, Allen & Co., due January 15, 1883, $2,025.48, indebtedness for goods bought; to P. V. Coldwell, in said business, due in thirty days, $354.45, for clerk-hire in said business; to Claflin, Allen & Co., due February 23, 1883, $1,041.46, for goods bought in said business; to William Coldwell, due in thirty days, $1,622.50, consideration being the $1,000 loan (principal and interest) hereinbefore mentioned as from his son William; and on December 25, to Smith, Frazier & Co., due February 1, 1883, $516, for goods bought in said business. The mortgages on December 21, as soon as executed, were by defendant on the afternoon of said day, filed for record in the order herein named. His wife, Martha J., was notified of the matter, and employed Messrs. Simpson & Bowker, attorneys at law, to advise and act for her in the matter. The defendant also employed said firm to act for Claflin, Allen & Co. under the mortgages; and

on that evening, defendant, by consent of said Simpson & Bowker, turned over to Mr. Cook, as trustee for the mortgagees, all of said goods under the mortgages, and on that eve telegraphed what had been done to Messrs. Claflin, Allen & Co., at St. Louis.    The said son William has continuously resided in Texas, and in December, 1881, in writing to his mother (said Martha J.) asked her to get his $1,000, or so much as she could, and forward it to him, as he was needing it, and to get the whole money as soon as she could and send to him.    She therefore acted for him under the mortgage, and employed Messrs. Simpson & Bowker for William as well as for herself: all of which facts defendant knew.    On the next day, or December 22, the defendant assigned his book accounts of his said business to the mortgagees above named, and paid $1,500 of the cash on hand to his wife, to be applied as follows: It seems that defendant in his lifetime received much money from his wife; among the amounts so received was $416, which the wife received from a deceased brother's estate in the year 1872, and which she at that time loaned to her husband, and which had never been repaid. This claim the defendant now paid, principal and interest, and the balance, or about $810, he paid to her for her son William, to be applied in satisfaction *pro tanto* on the said mortgage given on said December 21.    The remaining $140 of the cash on hand on December 21, defendant has paid out and expended in incidentals, small bills and debts, mostly for family expenses; and other property than above mentioned defendant has not, save household goods and wearing apparel.

"3. All the net profits of said business of defendant have been kept in the business, save to support his family in an economical way.

"4. On said December 21 said Waller returned to defendant and offered to accept the goods tendered on the day before on the claim of plaintiffs herein, but defendant refused to turn them out, though since December 21 defendant has never refused to give a mortgage on stock; and that on December 25, to Smith, Frazier & Co., was given on their request.

"5. In the winter of 1879 and 1880, he divided his law library, valued at $800 to $900, equally between his two sons, one of whom was the aforementioned William.    It was a gift to them.

"6. It is admitted on the trial that the transfers or mortgages named in the evidence were all valid, and given to

secure *bona fide* indebtedness, save those herein so fully mentioned, to Martha J. and William Coldwell, which it is claimed are not valid claims or indebtedness.    I find from the evidence that they are valid, including the $416 claim paid in cash. None of the trade creditors were notified of this indebtedness to wife and son.    No one of them ever asked defendant where the capital came from with which he started in this business, and he never informed them.    I do not find from a business standpoint that it was absolutely necessary that defendant suspend his business at the time and in the way he did.    It seems to me he might and ought to have carried out his first-contemplated plan of an accommodation with his creditors and an extension of time.    But defendant says, from the fact that some of the creditors or their attorneys were at enmity with him, and from all the circumstances as they appeared to him, he thought he could not do this; that the condition stood before him as a mountain unsurpassable.    He thought he could not continue in business, but must suspend.    I am not prepared to say it could not reasonably appear to him, and I therefore leave his statement with this, to my mind the most doubtful point passed and determined in defendant's favor. I see no reason why I should not, the burden of proof being on the plaintiffs' attachment.    And I do therefore find that the transfers made by defendant of his property were not for the purpose of hindering, delaying or defrauding his creditors; but succumbing, as he believed, to the inevitable, it was simply a preferring of creditors.

### "CONCLUSION OF LAW.

"That the attachments in the several causes be discharged."

Upon these findings of fact and this conclusion of law, the court below dissolved the attachment in each case, and the several plaintiffs as plaintiffs in error now bring their respective cases to this court and ask that the ruling of the court below dissolving said attachments be reversed.

In this court, the facts as above found, must be considered as settled and conclusive, for they were found principally upon parol testimony, and such testimony was sufficient to authorize the findings.    It must be confessed, however, that some of the evidence tended very strongly to cast suspicion upon the fairness and good faith of some of the transactions had in this case; but still we do not think that such evidence was or

is sufficient to authorize this court to overturn the findings made by the district court. This disposes of nearly all the brief of the plaintiffs in error, for nearly all of such brief is devoted to the discussion of the evidence for the purpose of showing that the trial court erred in such of its findings as tended to show good faith on the part of the defendant in mortgaging and disposing of his property as he did in December, 1882. The only question therefore for this court to consider is, whether the findings of the trial court are sufficient to sustain the ruling of the trial court in dissolving the attachments. In other words, do the findings of the trial court authorize such a ruling? or, on the contrary, do they show that the defendant disposed of his property, or a portion thereof, or that he was about to dispose of the same, for the purpose of hindering, delaying or defrauding his creditors?

It seems to be admitted by the plaintiffs in error that all the debts for which mortgages were given were valid and subsisting debts at the time such mortgages were executed, except the debts claimed to have been due to the defendant's wife and to his son William; and these last-mentioned debts, the plaintiffs claim, were fraudulent and trumped-up claims, created merely in the imagination of the parties, for the purpose of hindering, delaying and defrauding the honest and *bona fide* creditors of the defendant. The findings of fact, however, show that these debts claimed to have been due to the defendant's wife and son were valid, subsisting and *bona fide* debts at the time the mortgages were executed; and therefore, for the purposes of this case, and as the case is now presented to us, it must be considered as conclusive that such debts were valid, subsisting and *bona fide* debts at that time. We do not think that it is necessary to comment upon the evidence at all, and we do not think that it is necessary to comment upon the findings of fact, except in a general manner. We shall, therefore, in a very general manner, consider the principal points made by counsel for plaintiffs in error.

I. We think it is well settled, in this state at least, that a gift made by a husband to his wife, in good faith, and not

for the purpose of hindering, delaying or defrauding creditors, and at a time when the husband is not owing anything, is not void, but is valid in all respects and for all purposes. (*Horder v. Horder*, 23 Kas. 391, 392, and cases there cited; *Holthaus v. Farris*, 24 Kas. 784; *English v. Law*, 27 Kas. 242.)

II. We think it is also well settled, in Kansas, that a debtor, even in failing circumstances, may prefer creditors if the same is done in good faith; and this not only in the form of actual payment of money to the particular creditors preferred, but also in the form of the sale or appropriation of property, or the giving of chattel mortgages to such creditors. (*Arn v. Hoerseman*, 26 Kas. 413; *Randall v. Shaw*, 28 Kas. 419; *Avery v. Eastes*, 18 Kas. 505; *Bishop v. Jones*, 28 Kas. 680; Burrill on Assignments, §§ 161, *et seq.*, and 326.) But whether an insolvent debtor can, under the laws of Kansas, (Comp. Laws of 1879, ch. 6, § 1, *et seq.*,) in making a general and voluntary assignment to a trustee for the benefit of his creditors, prefer any one or more of such creditors, is at least doubtful. Probably he cannot do so. We shall have more to say, however, with reference to this question, further on in this opinion.

III. The plaintiffs in error claim that the defendant committed a fraud by refusing to pay the claim of Tootle, Hosea & Co. for $150 or $160 at the time when Waller, as the agent of Tootle, Hosea & Co., presented such claim to the defendant and demanded payment, it being admitted by the defendant that he had at that time over $1,600 in cash in his possession, which he could have used for that purpose if he had so chosen. Now it may not have been right for the defendant to refuse to pay said claim of Tootle, Hosea & Co. as he did; but did such refusal show conclusively that the defendant had disposed of, or was about to dispose of, his property, or any part thereof, for the purpose of hindering, delaying or defrauding his creditors? This is the ground upon which the plaintiffs' several attachments were issued. No wrong or fraud on the part of the defendant will benefit the plaintiffs in this case, unless such fraud or wrong was

the grounds, or tended to prove the grounds, set forth in the plaintiffs' affidavits for their attachments. The plaintiffs could sustain their attachments only by showing that the defendant did in fact dispose of, or was about to dispose of, his property, or a portion thereof, for the purpose of hindering, delaying or defrauding his creditors. We do not think that the defendant's refusal to pay the claim of Tootle, Hosea & Co., although he could easily have done so, proves this, or tends to prove that the grounds upon which the plaintiffs' attachments were founded were true. In connection with other facts, it might have done so; but the other facts in this case have been found against the plaintiffs by the court below.

IV. With reference to the mortgage executed by the defendant to his son William, the plaintiffs in error cite the cases of *Welch v. Sackett*, 12 Wis. 243, and *McCutchin v. Platt*, 22 Wis. 461. Now these cases have no application to the present case. They simply hold where a chattel mortgage or a bill of sale is executed to a creditor, in his absence and without his knowledge, and afterward, but before such creditor receives the same or has knowledge thereof, another creditor levies an attachment valid in all respects and issued upon sufficient grounds upon the same property covered by the chattel mortgage or bill of sale, the attachment lien in such a case has priority over the lien of the chattel mortgage or bill of sale. These cases do not hold that the chattel mortgage or bill of sale is void, or that it was executed for the purpose of hindering, delaying or defrauding creditors, or that it is any evidence of fraud, but only that the lien thereof must be postponed until the debt secured by the attachment lien is satisfied. Now this principle has no application to the present case. The chattel mortgage in the present case was delivered to an agent of the creditor and accepted by such agent before the attachments were issued or levied. But suppose that the mortgage had not been received by the creditor nor by his agent, until after the attachments were issued and levied upon the property: would this fact show that the defend-

ant had disposed of or was about to dispose of any of his property, with the intent to hinder, delay or defraud his creditors? And that was the question in issue in this case, and not a mere question of priority of liens between creditors, as in the Wisconsin cases. The Wisconsin cases do not hold that the chattel mortgage or bill of sale proved or tended to prove fraud. In the Wisconsin cases, the attachments were valid whether the mortgage or bill of sale was valid or not. But in the present case, it is claimed by the defendant that the attachments are void because the grounds therefor are untrue; and this, even if the mortgage itself is void. In the present case, the defendant claims that even if his son William obtained no lien upon the property attempted to be mortgaged to him, still that the attempted mortgage does not prove that he attempted to defraud his creditors, or that the grounds for the plaintiffs' attachments are true. We think it will be seen that this case and the Wisconsin cases are entirely different.

V. Plaintiffs in error, in their oral argument, but not in their brief, present one other question for consideration by this court. They claim that the several mortgages executed by the defendant to his several creditors, and the assignment of his book accounts to such creditors, constitute together a voluntary assignment to a trustee for the benefit of creditors, under § 1 of the act of 1868 regulating voluntary assignments for the benefit of creditors, (Comp. Laws of 1879, ch. 6, p. 99;) or that the execution of said mortgages and assignment is in violation of such act; or that, in some other manner, the execution of said instruments will, by virtue of such act, sustain the attachments obtained by the plaintiffs in this case. Now, waiving the irregular manner in which this point has been presented to this court, we would say that we do not think the chattel mortgages and the assignment executed under said act were in violation thereof. They were not executed to a *trustee*, as voluntary assignments under that act are required to be; but they were executed directly to the creditors themselves; and they were not executed in the manner in which that stat-

ute requires voluntary assignments to be executed. The mortgages were executed simply as chattel mortgages, and the assignment of the book accounts was executed just as an assignment of a book account should be; and none of these instruments were executed in violation of said act. There is nothing in said act that prohibits the execution of chattel mortgages, or that prohibits the transfer, by assignment or otherwise, of any kind of property to a creditor to secure the payment of a debt due to such creditor; nor is the execution of chattel mortgages, or the transfer or assignment of property, against the spirit or intention of said act.

With reference to voluntary assignments of insolvent debtors to trustees for the benefit of creditors, we would refer to Burrill on Assignments, and especially to §§ 161, 163, 167, 168, and 326. Of course chattel mortgages may in some cases be fraudulent, and transfers of property by assignment or otherwise may also in some cases be fraudulent, but they are not necessarily so; and taking the facts as found by the trial court, we think it cannot be said in the present case that the chattel mortgages and the assignment of said book accounts were in fact fraudulent; and unless they were in fact fraudulent, the plaintiffs certainly cannot sustain their attachments when there are no other grounds for the attachments except that these mortgages and this assignment were executed for the purpose of hindering, delaying and defrauding creditors. The court below found that they were all executed in good faith, and, as we have before stated, we cannot from the evidence say that these findings are not true, or set them aside.

But suppose that these mortgages and the assignment of the book accounts must be considered as having been executed under the act relating to assignments for the benefit of creditors; and suppose that they were executed so irregularly that they are void, but still that they were executed in good faith: could the plaintiffs even then maintain their attachments, which were issued upon the sole ground that the defendant had executed the same for the purpose of hinder-

ing, delaying and defrauding creditors? In this connection see *Harris v. Capell*, 28 Kas. 117.

We think the decision and judgment of the district court dissolving the attachments in the four cases above named must be affirmed.

All the Justices concurring.